**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HOMESITE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED AIRLINES HOLDINGS, INC.,<br><br>Defendant. | Case No. |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Homesite Insurance Company ("Homesite"), by and through its attorneys, alleges as follows against Defendant United Airlines Holdings, Inc. ("United"):

**NATURE OF THE ACTION**

1. This is an action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 concerning an excess follow-form cyber insurance policy issued by Homesite Insurance Company to United Airlines Holdings, Inc., policy number YXS-158749112-01 (the "Homesite Policy" attached as Exhibit A).

2. The Homesite Policy provides coverage in excess of policy number 01-123-36-04 issued by Lexington Insurance Company (the "Followed Policy" attached as Exhibit B).

3. United seeks coverage for a business interruption claim arising out of the July 2024 CrowdStrike outage (the "CrowdStrike Claim") under the terms of the Homesite Policy and Homesite denies it is obligated to provide insurance coverage for the CrowdStrike Claim.

4. United's claimed losses include, among other things, customer claim payments and purported downstream revenue losses.

5.      In contradiction to the Homesite Policy's terms, United seeks to recover from Homesite for losses for which it has already obtained recovery from third parties. United attempts to avoid the Policies' prohibition on double recovery by characterizing those recoveries as erosion of the $50 million Retention, but those recoveries do not satisfy the Followed Policy's narrow retention-erosion provision and instead must reduce the Loss United seeks to recover under the Homesite Policy.

6.      Now, therefore, Homesite seeks a declaration that the customer claim payments and downstream revenue losses are not covered "Loss" under the terms of the Followed Policy's Network Interruption Coverage Section which is incorporated into the Homesite Policy.

7.      In the alternative, Homesite seeks a declaration that United's claimed loss must be reduced by its recoveries from third parties for the same losses claimed in the CrowdStrike Claim because the Homesite Policy and the Followed Policy do not permit United to recover the same loss twice.

8.      Finally, Homesite further seeks a declaration that, after application of the $50 million retention, no amount is presently owed under the Homesite Policy with respect to the CrowdStrike claim.

**PARTIES**

9.      Plaintiff Homesite Insurance Company is a corporation organized under the laws of the State of Wisconsin and that maintains its principal place of business in the Commonwealth of Massachusetts.

10.      Defendant United Airlines Holdings, Inc. is the Named Insured under the Homesite Policy. United Airlines Holdings, Inc. is a Delaware corporation with its headquarters and principal place of business located in Chicago, Illinois.

2

**JURISDICTION AND VENUE**

11.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Homesite and United and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, because an actual controversy exists between Homesite and United regarding whether payment is owed under the terms and conditions of the Homesite Policy towards the CrowdStrike Claim.

13.     Venue is proper in this District under 28 U.S.C. § 1391 because United is headquartered in Chicago, Illinois, the Homesite Policy identifies United's address in this District, and a substantial part of the events and claim handling giving rise to this controversy are connected to United's Illinois operations and insurance program.

**THE HOMESITE POLICY AND FOLLOWED POLICY TERMS**

**The Homesite Policy**

14.     Homesite issued the Homesite Policy to United for the policy period June 1, 2024 to June 1, 2025. The Homesite Policy is an Excess Follow Form Cyber Liability Insurance Policy with a $5 million limit, participating as 50% of a $10 million quota-share layer that sits excess of $45 million.

15.     The Declarations identify the Followed Policy as Lexington Insurance Company policy number 01-123-36-04, which provides a $15 million limit of liability and a $50 million retention. The Followed Policy and the Homesite Policy are referred to collectively herein as the "Policies."

3

16.     The Homesite Policy states in bold capitalized type: "THIS IS A FOLLOW FORM INSURANCE POLICY. EXCEPT AS PROVIDED BELOW, THE COVERAGE PROVIDED INCORPORATES THE TERMS, DEFINITIONS AND CONDITIONS OF THE FOLLOWED POLICY IDENTIFIED ON THE POLICY DECLARATIONS." (Exh. A, 6).

17.     The Homesite Policy provides that, except to the extent specifically addressed in the Homesite Policy or an endorsement, coverage is "subject to all terms, conditions, representations, limitations, exclusions and restrictions of the Followed Policy." (*Id.*, 9).

18.     The Homesite Policy also provides that "[n]o action or payment by any other insurer of the Underlying Insurance shall bind the Insurer under this Policy." (*Id.*, 10).

19.     The Homesite Policy's Quota Share Amendatory endorsement provides that Homesite's quota-share participation is 50% and Homesite's limit of liability is $5 million. It further states that the obligations of the subscribing insurers are "several and not joint," that no subscribing insurer is responsible for the obligation of any co-subscribing insurer, and that "no action or omission by any of the co-subscribing insurers shall bind the Insurer or be deemed a waiver of any coverage defense the Insurer has under this Policy or available at law." (*Id.*, 17-19).

**The Followed Policy**

20.     The Followed Policy is a primary cyber policy whose terms, conditions, definitions, limitations, and exclusions are incorporated into the Homesite Policy, subject to its own terms and conditions.

21.     United's first-party business interruption claim was submitted solely under the Followed Policy's Network Interruption Coverage Section, with no other coverage part implicated.

22.     The Followed Policy's Network Interruption Coverage Section is a first-party coverage section. It provides that the insurer shall pay Loss in excess of the applicable retention

that an insured incurs "solely as a result of a Material Interruption," provided that the length of the Material Interruption exceeds the applicable waiting period. (Exh. B, 56).

23. The Network Interruption Coverage Section defines Loss as "the actual Business Income Loss, Expenses to Reduce Loss and Extra Expenses sustained or incurred by an Insured." (*Id.*, 58).

**Policy Provisions Addressing Business Income Loss**

24. The Followed Policy's Network Interruption Coverage Section defines "Business Income Loss" to include "net profits that would have been earned but for the Material Interruption" and "charges and expenses that necessarily continue", subject to the terms, limitations, and conditions of the policy. (*Id.*, 57).

25. When calculating Business Income Loss, the Followed Policy requires: "due consideration shall be given to: (1) "the experience of the business before the Material Interruption and the probable experience thereafter…"; (2) "the continuation of only those necessary charges and expenses that would have existed had no Material Interruption occurred"; and (3) Business Income Loss which is made up during the Extended Period of Indemnity (if any) or within a reasonable time…" thereafter. (*Id.*, 64).

26. The Followed Policy includes an Agreed Value – Flight Cancellations Only Endorsement that modifies the ordinary Business Income Loss calculation where a Material Interruption directly causes the cancellation of one or more insured flights. Under that endorsement, United may use pre-determined Agreed Flight Values for qualifying cancelled flights rather than undertaking the ordinary flight-by-flight business-income analysis otherwise required by the Network Interruption Coverage Section. (*Id.*, 83).

27. The Agreed Value – Flight Cancellations Only Endorsement further provides: "In calculating all other Loss not directly resulting from the cancellation of an Insured Flight, expenses, costs and profits associated with the operation of such cancelled Insured Flight shall not be considered." (*Id.*).

28. The Agreed Flight Value Endorsement does not eliminate the Policy's other requirements, including that the claimed loss constitute covered Loss, be sustained solely as a result of the Material Interruption, and not exceed the actual loss sustained by the insured. (*See generally*, *id.*, 83-84).

**Policy Provisions Addressing Covered Expenses**

29. The Network Interruption Coverage Section defines "Expenses to Reduce Loss" as "expenses incurred by the Insured during the Period of Indemnity, over and above normal operating expenses, for the purpose of reducing Business Income Loss or shortening the Period of Indemnity." (*Id.*, 57).

30. The Network Interruption Coverage Section separately defines "Extra Expenses" as "expenses incurred by the Insured during the Period of Indemnity or the Extended Period of Indemnity (if any), other than Expenses to Reduce Loss, that would not have been incurred but for a Material Interruption." (*Id.*).

31. The Followed Policy's Civil Aviation Fines & Compensation endorsement amends the Network Interruption Coverage Section's definition of Loss to include Civil Aviation Fines or Passenger Compensation that the Insured is legally liable to pay in respect of a Flight Cancellation or Delay. (*Id.*, 85-86).

32. The Civil Aviation Fines & Compensation endorsement defines Passenger Compensation as financial compensation paid or the cost of assistance, food, drink,

accommodation, or service provided to passengers by an insured "in order to comply with" a Passenger Compensation Law. (*Id.*).

33. Passenger Compensation Law is defined as any "law or regulation requiring an airline to compensate and assist passengers in the event of any flight delay, denied boarding or flight cancellation," including identified foreign passenger-compensation regimes and amendments or replacements thereof. (*Id.*).

34. Comparatively, the Homesite Policy contains the Drop Down – Follow Specific Sublimited Coverages endorsement which provides a sublimit for Civil Aviation Fines & Compensation of $3.75 million part of $7.5 million, excess of $30 million, and states that such sublimits are part of, and not in addition to, the applicable limit of liability. (Exh. A, 15-16).

**The Followed Policy's Relevant Limiting Provisions**

35. The Followed Policy contains the Network Interruption Coverage Section which, in part, excludes coverage for loss "arising out of, based upon or attributable to: (1) any liability to third-parties for whatever reason; (2) legal costs or legal expenses of any type; or (3) unfavorable business conditions." (Exh. B, 62).

36. The Network Interruption Coverage Section also excludes coverage "for any … contractual penalties or consequential damages." (*Id.*).

37. The Network Interruption Coverage Section provides that coverage "shall not exceed the actual loss sustained by an Insured." (*Id.*, 64).

38. The Network Interruption Coverage Section also provides: "No Loss or part of Loss shall be paid hereunder to the extent an Insured has collected such Loss or part of Loss from an Outsource Provider or any other third party." (*Id.*).

**The Followed Policy's Provisions Addressing Proof of Loss**

39.     The Network Interruption Coverage Section requires, before coverage will apply, that the insured complete and sign a written, detailed and affirmed proof of loss including a full description of the loss and circumstances, a detailed calculation of the loss, and all underlying documents and materials reasonably relating to or forming part of the basis for the proof of loss. (*Id.*, 63).

40.     The Network Interruption Coverage Section further requires the insured to provide cooperation and assistance requested by the insurer, including assistance with any investigation of a Covered Event, Loss, or circumstance and any calculation or appraisal conducted by or on behalf of the insurer. (*Id.*, 63-64).

41.     The Approved Forensic Accountants Endorsement designates Kevin O'Toole of Ankura as an approved forensic accountant to determine the quantum of Loss. (*Id.*, 99).

42.     The endorsement provides that United and the Insurer "shall jointly task and budget" Ankura regarding the scope and cost of any investigation, and that any final report issued by Ankura will be provided to the insurer and "will be definitive only with respect to the quantum of Loss, and not with respect to any determination of insurance coverage under the policy." (*Id.*).

43.     Nothing in the Ankura endorsement eliminates or modifies United's separate proof-of-loss obligations under the Network Interruption Coverage Section, including United's obligation to provide a detailed calculation of the claimed Loss and the underlying documents and materials reasonably relating to or forming part of the basis for that proof of Loss. (*Id.*).

8

**The Applicable Retention**

44. The Followed Policy provides that the insurer is liable only for Loss arising from a Claim or First Party Event that exceeds the applicable $50 million Retention and further provides that such retention "must be borne by the Insureds and remain uninsured." (*Id.*, 13).

45. The Followed Policy contains a narrow exception permitting recognition of erosion by other insurance only where United is an additional insured under a policy issued to a third party, the Followed Policy is excess over and does not contribute with that policy with respect to Loss covered under this policy, and payments are made "on behalf of" United "under such policy" for covered Loss under the Followed Policy. United may not apply a third-party recovery against the Retention unless the payment satisfies those specific requirements. (*Id.*).

46. Separately, the Followed Policy's Network Interruption Coverage Section expressly provides that "[n]o Loss or part of Loss shall be paid hereunder to the extent an Insured has collected such Loss or part of Loss from an Outsource Provider or any other third party." (*Id.*, 64).

47. United's recoveries from third parties relating to the same losses United claims in the Crowdstrike Claim do not satisfy the Followed Policy's narrow retention-erosion provision.

48. Any recoveries therefore must reduce the Crowdstrike Claim Loss that United now seeks to recover under the terms of the Policies.

**THE CROWDSTRIKE CLAIM**

49. On or about July 19, 2024, United experienced computer outages following a faulty CrowdStrike Falcon update pushed through to United's computer systems. United experienced several days of outage-related disruption, including flight cancellations and an inability to process

9

payments at airports. United restored full functionality to its computer systems by the morning of July 22, 2024, with only one flight cancelled on that day.

50. United submitted the CrowdStrike Claim under its cyber insurance program on or about June 18, 2025, with a spreadsheet summarizing claimed Network Interruption losses.

51. The final written report from Ankura was not provided to Homesite.

52. The CrowdStrike Claim includes losses resulting from customer claim payments, consisting of electronic travel certificates, frequent-flyer mileage awards, and/or other customer accommodations.

53. United issued the customer claim payments to include, among other things, electronic travel certificates that United characterized as "gestures of goodwill" to inconvenienced customers, as well as cash payments, and amounts described as hotels, meals, ground transportation, frequent-flyer mileage awards, and minor in-flight food and beverage amounts.

54. United did not provide the underlying source documentation or a detailed breakdown for most of those claimed losses.

55. United has contended that all of these customer claim payments were required by law and therefore qualify as covered "Passenger Compensation" under the Policies.

56. United has not identified any specific "law or regulation" that "required" United to issue the customer claim payments. (Exh. B, 85).

57. United issued the customer claim payments without its insurers' prior written consent.

58. The CrowdStrike Claim also seeks coverage for downstream revenue losses, including alleged return-leg and connecting-segment losses associated with flights that ultimately operated as scheduled after United's systems were restored.

59. United claims these downstream revenue losses in addition to Business Income Loss claimed for cancelled flights using the Agreed Flight Value methodology.

60. United computed the purported downstream revenue losses by applying a discounted version of the Policies' Agreed Flight Values to an estimated population of passengers whose cancelled flights allegedly occurred at the beginning or middle of their itineraries.

61. United's calculation of its purported downstream revenue losses is improper under the terms of the Policies.

62. The Agreed Flight Value Endorsement applies only to cancelled insured flights, not to alleged revenue losses associated with flights that ultimately operated as scheduled.

63. That calculation further rests on the unsupported assumption that those passengers would not have rebooked or completed later flight segments

64. United did not test its assumption against actual data.

65. United's downstream revenue-loss calculation also fails to account for whether United "made up" revenue in the days following the alleged Material Interruption, including from increased demand or passenger overflow from other airlines that recovered less quickly from the CrowdStrike outage as required by the Followed Policy's Network Interruption Coverage Section. (Exh. B, 64).

**UNITED'S RECOVERY FROM THIRD PARTIES**

66. Upon information and belief, United sought and successfully recovered from third parties toward the same outage-related business interruption losses it now seeks to recover under the terms of the Homesite Policy and claimed as part of the CrowdStrike Claim.

67. The terms of the Followed Policy's Network Interruption Coverage Section covers only actual Loss sustained by United and expressly provides that "[n]o Loss or part of Loss shall

be paid hereunder to the extent an Insured has collected such Loss or part of Loss from an Outsource Provider or any other third party." (Exh. B, 64).

68.     Therefore, United's recoveries from third parties for the losses encompassed within the CrowdStrike Claim reduces the amount of Loss that United may now claim under the Homesite Policy.

69.     Any recoveries by United do not erode United's $50 million retention under the Followed Policy because they do not satisfy the retention-erosion provision and instead reduce the loss that United may claim from its cyber insurers.

## COVERAGE CONTROVERSY

**Recovery from Third Parties**

70.     An actual, justiciable controversy exists between Homesite and United concerning whether United may seek payment from Homesite for losses that United has already recovered from third parties. Homesite contends those recoveries reduce United's claimed Loss under the Policies; United contends they erode the $50 million Retention and therefore allow United to seek the same losses from Homesite.

71.     United has already recovered from third parties for losses encompassed within the same CrowdStrike Claim, yet now seeks to recover those same losses again from Homesite. United cannot avoid the Policies' prohibition on double recovery by characterizing those recoveries as erosion of the Retention when they do not satisfy the Followed Policy's narrow retention-erosion provision and, under the Network Interruption Coverage Section, must instead reduce the Loss United seeks to recover.

72.     The Followed Policy provides that the retention "must be borne by the Insureds and remain uninsured," subject to a narrow exception for payments made "on behalf of" an Insured as

an additional insured under a policy issued to a third party where the policy is excess over and does not contribute with such policy with respect to covered Loss under the Followed Policy. (Exh. B, 13).

73.     The Network Interruption Coverage Section covers only actual Loss sustained by United and expressly provides that "No Loss or part of Loss shall be paid hereunder to the extent an Insured has collected such Loss or part of Loss from an Outsource Provider or any other third party." (*Id.*, 64).

74.     Allowing United to apply recoveries encompassing the same losses claimed in the CrowdStrike Claim to erode its retention, while also seeking the same losses from Homesite, would permit an impermissible double recovery.

**Customer Claim Payments**

75.     An actual, justiciable controversy exists between Homesite and United concerning whether certain claimed customer claim payments represent covered Loss under the Network Interruption Coverage Section and/or the Civil Aviation Fines & Compensation endorsement.

76.     Homesite has denied coverage for the customer claim payments on the basis that they are not covered Loss under the Network Interruption Coverage Section to the extent they arise out of, are based upon, or are attributable to liability to third parties, contractual penalties, consequential damages, voluntary goodwill payments made without the insurers' consent, or amounts not incurred solely as a result of a Material Interruption.

77.     The customer claim payments do not qualify as Passenger Compensation because they were not paid "in order to comply with" a "law or regulation" that "requires" an airline to compensate and assist passengers in the event of a flight delay, denied boarding, or flight cancellation and are therefore not recoverable under the terms of the Policies. (Exh. B, 85).

13

78. United also has not provided sufficient underlying source documents or detailed data to substantiate the full amount and nature of the electronic travel vouchers, cash payments, hotels, meals, ground transportation, and other customer claim payments, or to demonstrate that those payments were made solely as a result of a Material Interruption.

**Downstream Revenue Losses**

79. An actual, justiciable controversy also exists between Homesite and United concerning whether certain claimed downstream revenue losses are covered as Business Income Loss under the Network Interruption Coverage Section.

80. The claimed downstream revenue losses are purportedly associated with later flight segments that operated as scheduled after United's systems were restored.

81. United improperly calculated those alleged losses by applying the Policy's Agreed Flight Values, even though the Agreed Flight Value methodology applies only to cancelled insured flights.

82. The Network Interruption Coverage Section provides that coverage shall not exceed the actual loss sustained and requires due consideration of United's business experience before and after the Material Interruption and any Business Income Loss "made up" during the Extended Period of Indemnity or within a reasonable period thereafter.

83. United has not substantiated this category of claimed loss with the type of actual financial data required by the Network Interruption Coverage Section, nor did it take into account the extent to which revenue was made up during the Extended Period of Indemnity, or the actual loss sustained by United. Ankura did not provide a final report explaining the bases for the claimed downstream revenue losses.

84. The Network Interruption Coverage Section makes satisfactory proof of Loss a condition to coverage, providing that, "before coverage will apply," United must submit a written, detailed, and affirmed proof of loss that includes a full description of the Loss and surrounding circumstances, a detailed calculation of any Loss, and all underlying documents and materials reasonably relating to or forming part of the basis for the proof of Loss. United may not recover amounts that have not been substantiated through the detailed calculation, source documentation, and cooperation required by the Policy. United cannot satisfy the Policies' proof-of-loss requirements by estimating downstream revenue losses from Agreed Flight Values.

## COUNT I — DECLARATORY JUDGMENT: NO AMOUNT IS OWED UNDER THE HOMESITE POLICY

85. Homesite incorporates the preceding paragraphs as though fully set forth herein.

86. An actual, justiciable controversy exists between Homesite and United concerning whether any amount is owed under the Homesite Policy for the CrowdStrike Claim.

87. After offsetting United's claimed losses by third-party recoveries for the same losses in accordance with the terms and conditions of the Followed Policy, United has been fully compensated for any covered loss that could reach the Homesite Policy.

88. Additionally, United's claimed losses do not reach Homesite's layer if the customer claim payments or downstream revenue losses are excluded or otherwise not covered.

89. Homesite has denied coverage for United's claim and United has disputed its denial.

90. Pursuant to 28 U.S.C. § 2201, Homesite is entitled to a declaration that, based on the terms, exclusions, conditions, retentions, sublimits, limits, and offsets described above, no amount is owed by Homesite to United with respect to the CrowdStrike claim.

**PRAYER FOR RELIEF**

WHEREFORE, Homesite Insurance Company respectfully requests that the Court enter judgment in its favor and against United Airlines Holdings, Inc. as follows:

A.      Enter a declaratory judgment that the certain customer claim payments do not constitute covered Loss under the Policies, or in the alternative are subject to all applicable sublimits, exclusions, retentions, and conditions;

B.      Enter a declaratory judgment that the certain claimed downstream revenue losses do not constitute covered Business Income Loss under the Policies;

C.      Enter a declaratory judgment that United's recoveries from third parties for the same losses forming the CrowdStrike Claim reduces the total amount of Loss United may claim under its cyber insurance program and does not erode the $50 million retention;

D.      Enter a declaratory judgment that no payment is owed by Homesite to United in connection with the CrowdStrike Claim; and

E.      Awarding Homesite its costs and such other and further relief as the Court deems just and proper.

Dated: July 20, 2026

Respectfully submitted,

SKARZYNSKI MARICK & BLACK LLP


By: */s/ James H. Kallianis, Jr.*
    James H. Kallianis, Jr. (#6207178)
    Eric A. Simon (#6342955)
    SKARZYNSKI MARICK & BLACK LLP
    500 W. Madison Street, Suite 3600
    Chicago, IL 60661
    Tel: (312) 946-4200
    Fax: (312) 946-4272
    jkallianis@skarzynski.com
    esimon@skarzynski.com